UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

LEE VALLEY TOOLS, LTD., et al.,

                    Plaintiffs,

       v.

INDUSTRIAL BLADE COMPANY,

                 Defendant.

_____

<u>DECISION & ORDER</u>

10-CV-6242CJS

## <u>PRELIMINARY STATEMENT</u>

Plaintiffs Lee Valley Tools, Ltd., Veritas Tools, Inc. (Canada) and Veritas Tools, Inc. (USA) (collectively "Veritas") have sued defendant Industrial Blade Company ("IBC") for false advertising and unfair competition in connection with IBC's manufacture and sale of hand plane blades. (Docket # 1 at ¶ 1). For many years until 2009, IBC supplied blades to Veritas that were incorporated into Veritas's hand planes. (*Id*. at ¶¶ 1, 17). According to Veritas, IBC supplied the blades in conformity to Veritas's specifications, and Veritas performed finishing steps on the blades prior to their incorporation into the hand planes. (*Id.* at ¶¶ 18-19). The parties' business relationship ended in approximately December 2009, when Veritas decided to begin manufacturing the blades in-house. (*Id*. at ¶ 1). At that point, according to Veritas, IBC began supplying blades to Veritas's competitor, Woodcraft Supply, LLC ("Woodcraft").[1] (*Id.*).

_____

[1] Veritas originally sued Woodcraft Supply, LLC and Robert Cosman. (Docket # 1). Those defendants have been dismissed from the case. (Docket ## 25, 28).

Veritas contends that the advertisements for IBC's hand plane blades wrongfully claim credit for awards and accolades earned by Veritas's hand planes. (*Id*. at ¶¶ 21, 24-26).

IBC has asserted counterclaims for breach of contract, tortious interference with business relations, misappropriation of trade secrets, unfair competition, trade dress infringement, false advertising and trade libel arising out of Veritas's in-house manufacture of blades used in Veritas's hand planes. (Docket # 16). According to IBC, it contracted with Veritas to be the sole supplier of blades for Veritas's hand planes. (*Id*. at ¶¶ 9-10). IBC contends that Veritas breached that agreement by manufacturing the blades in-house. IBC also contends, *inter alia*, that Veritas's in-house manufacture constitutes trade dress infringement and misappropriation of IBC's trade secrets. (*Id*. at ¶¶ 16-18, 33-34, 47-51).

Currently pending before this Court are two motions filed by IBC. The first seeks an order precluding Veritas from relying upon certain financial documents that IBC contends were not timely produced. (Docket # 61). The second seeks an order striking the report of Veritas's damages expert, Christopher C. Barry ("Barry"). (Docket # 60). For the reasons discussed below, both motions are denied.


## I.  IBC's Motion to Preclude

### A.  Factual Background

IBC seeks to preclude Veritas from relying upon financial documents that were attached to Barry's expert report. (Docket # 61). According to IBC, Veritas never produced the majority of those documents during fact discovery despite the fact that they were responsive to IBC's Second Set of Requests for Production of Documents, which were served on June 10,

2011.  (Docket # 61 at 1-2).  Specifically, Requests 47-50 of IBC's document demands sought documents reflecting the sales volume, revenues and profits for Veritas's blades manufactured in-house and hand planes incorporating those blades.  (Docket # 84 at ¶ 4 and Exhibit ("Ex.") B).

Veritas responded to the document requests by asserting objections on the grounds of burdensomeness and relevance and the absence of any specified time period applicable to the requests.  Veritas nonetheless represented that it would produce documents responsive to three of the four requests.  (Docket # 73 at 2-3).  According to Veritas, because it did not keep records reflecting line item sales and profits, it produced a document summarizing the requested information.[2]  (Docket # 75 at ¶ 8; Docket # 84, Ex. F at 19).

As the litigation progressed, the parties communicated on several occasions about document production issues, particularly as the date for depositions approached.  (Docket # 84 at Ex. F).  The parties dispute whether those communications resulted in an agreement that Veritas would produce financial information in summary form only.  (*Compare* Docket # 75 at ¶¶ 9-12 *with* Docket # 84 at ¶¶ 36-37).  Veritas claims that they did; IBC, by contrast, claims that it agreed to accept summary information concerning Veritas's sales of hand planes, but not sales of in-house blades or hand planes incorporating those blades.

### 1.  Communications Between the Parties about Document Requests

According to IBC, during a telephone conference on September 8, 2011, Veritas represented that it had produced all financial documents responsive to IBC's document requests.  (Docket # 84 at ¶ 22).  After that call, counsel for Veritas sent an email to counsel for IBC stating

---

[2]  Neither party has attached or identified this document in the pending motion papers.  IBC maintains that it is unable to identify the document in Veritas's production and, despite repeated requests from IBC, Veritas still has not identified the document by Bates number.  (Docket # 83 at 8 n.7).

that it had produced a "clear statement of sales, revenues, profits in response to IBC's . . . request" and requested that IBC produce a similar document. (Docket # 84, Ex. F at 19). During a subsequent phone conference on September 13, 2011, IBC requested that Veritas produce "financial data relating to [Veritas's] hand plane sales dating back to 1999." (Docket # 84 at ¶ 23). According to Veritas, this communication was IBC's first request for sales information relating to hand planes extending back to 1999.

As IBC has explained, it was seeking information concerning Veritas's sales of hand planes and of blades for two different purposes. First, it was seeking – through its formal requests – documents reflecting Veritas's sales revenues and profits for blades manufactured in-house (and hand planes incorporating those blades) from 2008 to the present in order to calculate damages on its infringement claim. (Docket # 84 at ¶ 4 and Ex. B at 9). Second, it was seeking – through its informal request – documents reflecting sales revenues and profits for hand planes from 1999 to the present in order to defend against Veritas's false advertising and unfair competition claims.[3] (Docket # 84 at ¶ 28, Ex. F at 10). IBC maintains that this second category of information is relevant to demonstrate that Veritas's hand plane sales increased once they were fitted with IBC's blades – evidence that purportedly undercuts Veritas's contention that IBC unfairly traded on the good will of Veritas's hand planes. (Docket # 84, Ex. F at 7).

Veritas resisted IBC's request for financial information dating back to 1999, arguing that only revenues after 2009 (when Veritas allegedly breached its contract with IBC) were relevant to the litigation. (*Id.* at 9). According to IBC, as a compromise, it agreed to limit

---

[3] IBC altered the time period for which it requested hand plane sales information; at times it requested information from 1984 to the present, while at other times it requested information from 1998 or 1999 to the present. (Docket # 84, Ex. F at 2, 3, 7, 8 and 10).

the request to "summary documents evidencing the revenue and profit data requested." (Docket # 84 at ¶ 30).

Veritas thereafter provided a summary document on September 27, 2011, which IBC found inadequate. (Docket # 84, Ex. F at 5-6). During a conference call to address the purported deficiency, IBC confirmed its willingness to accept summary financial information. (Docket # 75 at ¶ 10). On October 4, 2011, Veritas produced another summary revenue report, which it described in its covering email as "agreed upon last week." (Docket # 75 at Ex. E). IBC did not dispute that characterization or move to compel production of any additional financial information. (*Id.* at ¶¶ 11-12).

In sum, IBC contends that although it agreed to accept summary financial information regarding *hand plane* sales, it never agreed to accept summary financial information regarding *in-house blade* sales, and Veritas was thus required to produce all documents and information reflecting sales and revenues relating to Veritas-manufactured *blades* from 2008 to the present. (Docket # 83 at 7-8). Moreover, IBC maintains that Veritas should have known that IBC's informal request for *hand plane* sales and revenues did not modify its original request for financial information for in-house *blades* (and hand planes incorporating those blades). In support of this contention, IBC has produced the following email communication dated September 29, 2011, from counsel for IBC to counsel for Veritas:

> You did not even provide information that fell under our initial production requests, notwithstanding our recent request for financials from 1998-present . . . We request information regarding sales, revenue, and profit information for *all* hand planes *and* blades sold by Plaintiffs. It would stand to reason that if Plaintiffs now manufacture blades in-house, everything they sell (aside from IBC inventory) would include such a blade and thus falls under our

initial production requests.  Further we have recently requested
summary statements from 1998-present, not just for damages
calculations, but to defend against Plaintiffs' claims.

(Docket # 84, Ex. F at 2-3).

Veritas maintains that it properly objected to the formal discovery requests

because they were unlimited in time and too broad in scope.  (Docket # 75 at ¶¶ 4-5).  Veritas

further maintains that it viewed its subsequent communications with IBC concerning requested

financial information as negotiations over the scope of the formal discovery requests.  (Docket

# 73 at 3-4, 9).  Thus, according to Veritas, it had a good faith understanding in September 2011

that IBC was willing to accept summary information in satisfaction of its formal discovery

requests.

### 2.  Additional Summary Produced at IBC's Deposition of Veritas's President

Veritas produced an additional summary financial document during the November

3, 2011 deposition of Veritas's President, Robert Lee.[4]  (Docket # 75 at ¶ 17).  This document

was created from reports prepared by Steven Oszmian, a Veritas engineer.  (*Id.* at ¶ 18).

Although Lee had been designated to testify concerning financial information on behalf of

Veritas, IBC did not question Lee during his deposition about either Veritas's financial

information in general or the specific financial summaries produced by Veritas.  (*Id.* at ¶¶ 21-22).

### 3.  Expert Reports

After the close of fact discovery on November 10, 2011, IBC identified its

damages expert Philip Green ("Green") and provided Veritas with his report.  (*Id.* at ¶ 24).

---

[4]  This document was later Bates numbered LVT0102317-24 and is among the documents that IBC seeks to
exclude.  (*Id.*).

Green's report relied upon the summaries provided by Veritas on September 27, 2011 and October 4, 2011, to calculate IBC's damages from Veritas's alleged infringement. (Docket # 84 ¶ 60 and Ex. O; Docket # 75 at ¶ 11 and Ex. E). In calculating infringement damages, Green identified Veritas's total revenues from sales of the allegedly infringing products, but did not reduce the revenues by any manufacturing or other costs. (Docket # 75 at ¶¶ 25-27).

After receiving Green's report, Veritas retained Barry to draft a rebuttal expert report, which it provided on January 27, 2012. (*Id*. at ¶¶ 29, 33). Barry's report calculates Veritas's profits from the sales of allegedly infringing hand planes by reducing the sales revenues by associated costs. The financial documents, including cost information, upon which Barry relied were attached to his report and are the subject of IBC's instant preclusion motion. (*Id*. at ¶ 34).

Veritas contends that all of the data and information contained in the documents "were either previously provided to IBC during fact discovery or extracted and collected by [Veritas] in December 2011 – January 2012 in order to rebut IBC's damages claims." (*Id.* at ¶ 35). According to Veritas, it did not produce the documents before expert discovery because it (1) believed that it had complied with IBC's discovery requests by providing summary information in September and October 2011 and (2) did not know before reviewing IBC's expert report that IBC would seek to prove infringement damages with evidence of Veritas's sales revenues. (Docket # 73 at 8-9). IBC counters that Veritas's production of the documents was untimely and frustrated its ability to conduct fact discovery and to prepare its expert report. (Docket # 61 at 5; Docket # 85 at 3-4).

## B. Discussion

Rule 37(c)(1) provides that if a party fails to disclose information "as required by Rule 26(a) or (e), the party is not allowed to use that information . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The purpose of this rule is "to prevent the practice of 'sandbagging' an adversary with new evidence." *See Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 156 (S.D.N.Y. 2012) ("*Ritchie Risk*") (quoting *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004)). In addition to preclusion, the rule also affords the court discretion to impose lesser sanctions, such as monetary sanctions or an adverse jury instruction, "in addition to or instead of this sanction." Fed. R. Civ. P. 37(c)(1); *Ritchie Risk*, 280 F.R.D. at 156 ("imposition of the preclusion sanction remains within the trial court's discretion").

The party seeking Rule 37 sanctions bears the burden of showing that the opposing party failed to timely disclose information. *See Lodge v. United Homes, LLC*, 787 F. Supp. 2d 247, 258 (E.D.N.Y. 2011). "A failure to disclose under Rule 37 encompasses ... the untimely production of documents and information required to be produced." *Id.* (quoting *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007)).

### 1. Veritas's Violations of Rule 26(a) and (e)

Rule 26(a)(1)(A)(ii) provides that "a party must, without awaiting a discovery request, provide to the other parties . . . a copy . . . of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(ii). In addition, Rule 26(e)(1) provides that a "party who has made a disclosure under Rule 26(a) – or who has

responded to a[] . . . request for production . . . must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the . . . response is incomplete or incorrect."  Fed. R. Civ. P. 26(e)(1).  The duty to supplement applies to responsive documents that are created after a party has served a response to a discovery request.  *Robbins & Myers, Inc. v. J.M. Huber Corp.*, 274 F.R.D. 63, 76-77 (W.D.N.Y. 2011).

The financial documents at issue include summaries of costs associated with and revenues generated by Veritas's sales of hand planes and blades.  The summaries are directly responsive to IBC's June 2011 document requests and will be used by Veritas to defend against IBC's infringement damages calculation.[5]  Thus, Veritas had a duty to disclose these documents, as well as the underlying data on which the summaries are based.  *See Kam Hing Enters., Inc. v. Wal-Mart Stores, Inc.*, 359 F. App'x 235, 238 (2d Cir. 2010) (district court did not abuse discretion in precluding testimony about costs where defendant had produced only summaries of costs and not underlying data upon which summaries were based).  Even assuming that some or all of the summaries were created after the close of discovery, the underlying data used to create them undoubtedly existed and should have been produced or made available to IBC during the discovery period.

## 2.  Substantial Justification and Harmlessness

Courts should not impose sanctions under Rule 37(c)(1) "where a party's failure to comply" with Rule 26(a) or (e) "was 'substantially justified' or where the conduct was 'harmless.'"  *Ritchie Risk*, 280 F.R.D. at 158-59.  "Substantial justification means justification to

---

[5]  Pursuant to 15 U.S.C. § 1117(a), IBC, as the plaintiff on its counterclaim for infringement, has the burden to prove Veritas's sales of ingringing products, while Veritas has the burden to prove any costs or other deductions associated with such sales.  *See GTFM, Inc. v. Solid Clothing Inc.*, 215 F. Supp. 2d 273, 304 (S.D.N.Y. 2002).

a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request." *Kunstler v. City of New York*, 242 F.R.D. 261, 264-65 (S.D.N.Y. 2007) (internal quotations and citations omitted). "Harmlessness means an absence of prejudice." *Ritchie Risk*, 280 F.R.D. at 159. The party that failed to comply with its discovery obligations bears the burden of proving that its failure was both substantially justified and harmless. *Id.*

Veritas contends that its failure to produce all of the financial summaries, as well as the data underlying them, prior to the discovery cutoff is justified by its belief that IBC had agreed to limit Veritas's obligations to production of the summary supplied on October 4, 2011. Plainly, the parties' communications about production of financial information are not a model of clarity. That said, Veritas, as the party who seeks to use the financial documents in support of its infringement defense, was required to determine promptly – certainly before the close of discovery – what information it may use to support its defenses and to provide that information to IBC. In addition, although Veritas's understanding that IBC would accept summary financial documents may explain Veritas's failure to produce the underlying data, it does not explain Veritas's failure to produce those financial summaries it would need to defend itself prior to the deadline for completion of fact discovery.

Veritas's excuse that it was unaware of IBC's damages theory prior to the close of discovery is equally unavailing. Proof of sales of infringing products is a statutorily-specified manner of establishing damages under Section 35 of the Lanham Act, 15 U.S.C. § 1117(a), and IBC's report utilizing that methodology could hardly have been a surprise. Indeed, in its answer and counterclaim, IBC asserted that it was entitled to recover Veritas's profits pursuant to 15

U.S.C. § 1117. (Docket # 16 at ¶¶ 31, 38, 45). On this record, I find that Veritas has not demonstrated that its failure to produce the underlying data or to timely produce the financial summaries was substantially justified.

Veritas also has not satisfied its burden of demonstrating that its failure to make timely disclosures was harmless. The bulk of the financial documents were provided after the close of fact discovery, which deprived IBC of the discovery necessary to challenge the summaries, as well as the data underlying them.[6] In addition, IBC's damages expert did not have the opportunity to review the bulk of the financial summaries or the underlying data prior to preparing his expert report. Although Veritas has conceded that IBC's expert may supplement his report based upon the newly-produced information, such an undertaking will be time-consuming and expensive.

### 3. Appropriate Sanction

The decision whether to issue a preclusion order, or a lesser sanction, is within the discretion of the trial court. *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 297-98 (2d Cir. 2006). "[P]reclusion of evidence is a harsh remedy, [and] it should be imposed only in rare situations." *Ritchie Risk*, 280 F.R.D. at 156-57 (internal citations and quotations omitted). In determining whether preclusion or another sanction is appropriate, a court should consider: "(1) the proponent's explanation for failing to provide the subject evidence; (2) the importance of such evidence to the proponent's case; (3) the opponent's time needed to prepare to meet the

---

[6] Of the three summaries Veritas produced before the close of fact discovery, IBC seeks to preclude use of one – the summary produced during Lee's deposition. IBC contends that it could not have meaningfully questioned Lee about that summary because IBC did not have sufficient time to review the document before the deposition. (Docket # 83 at 6-7). IBC has not explained, however, why it did not object and reserve its right to re-open the deposition.

evidence; and (4) the possibility of obtaining a continuance to permit the opponent to meet the evidence." *Turley v. ISG Lackawanna, Inc.*, 803 F. Supp. 2d 217, 229 (W.D.N.Y. 2011) (citing *Outley v. City of New York*, 837 F.2d 587, 589 (2d Cir. 1988)). "While a showing of 'bad faith' is not required for preclusion to be ordered under Rule 37(c), a party's bad faith 'can be taken into account' by the Court in considering the party's explanation for its failure to satisfy its discovery obligations." *Ritchie Risk*, 280 F.R.D. at 157 (quoting *Design Strategy, Inc. v. Davis*, 469 F.3d at 296).

Although Veritas failed without substantial justification to comply with its discovery obligations, consideration of the above four factors leads me to conclude that preclusion is too harsh a sanction for its conduct. First, nothing in the record suggests that Veritas's conduct involved bad faith. Second, the financial information that IBC seeks to preclude is critical to Veritas's ability to rebut IBC's damages calculation. According to Veritas's expert, the deduction of costs from sales revenues actually results in a net loss. (Docket # 74, Ex. D at ¶ 25).

Although IBC has been prejudiced by Veritas's failure to produce the underlying financial data and to timely produce the financial summaries, it has done little to prevent or mitigate that prejudice, however. IBC knew as early as September 29, 2011, that Veritas, despite its representations to the contrary, had not supplied the underlying data or the financial summary disclosures to defend against IBC's damages theory. (Docket # 84, Ex. F at 2). Instead of challenging the deficiency, IBC remained silent after Veritas provided the financial summary on October 4, 2011, failed to question Lee about profits or costs and failed to move to compel Veritas to disclose the information. Rule 37(c) is designed to deter a party from sandbagging an

opponent at trial with information that the opponent did not know existed, not to permit a party

to gain an unfair tactical advantage by knowingly sitting on its rights.

Finally, Veritas produced the financial summaries shortly after the discovery

deadline and well in advance of any trial of this matter.  Indeed, no trial date has been set for this

matter and the summary judgment motion has been held in abeyance pending the outcome of this

dispute (Docket # 71) so a continuance to allow IBC time to conduct limited discovery and to

supplement its expert report is not unreasonable.  *See Safespan Platform Sys. Inc. v. EZ Access,*

*Inc.*, 2011 WL 7473467, *4 (W.D.N.Y. 2011) ("unlike the cases cited by defendants, this

discovery issue did not arise at the eve of trial or present a novel theory late in the proceedings"),

*report and recommendation adopted by*, 2012 WL 777305 (W.D.N.Y. 2012); *see also Boyde v.*

*Monroe Cnty.*, 2011 WL 4457668, *4 (W.D.N.Y. 2011) (preclusion not appropriate sanction

where court could grant a continuance by re-opening discovery).

Although I find that Veritas's discovery failures do not warrant an order of

preclusion, they do justify the imposition of fee shifting for supplemental discovery and expert

reports.  *See Ritchie Risk*, 280 F.R.D. at 157 (where a party's failure to comply with its discovery

obligations causes an opposing party to incur additional expenses, those expenses may properly

be shifted to the non-compliant party).  In addition, Veritas's discovery delinquencies also justify

re-opening the discovery period to allow IBC to conduct additional discovery relating to the

untimely disclosures.  *See Boyde v. Monroe Cnty.*, 2011 WL 4457668 at *4.

For the reasons set forth above, I direct that:

(1)     Veritas produce or make available to IBC by no later than **February 22,**
        **2013** documents or information reflecting its sales, revenues, gross profits

and net profits from the sale of Veritas hand planes or in-house blades from 2008 to the present;

(2)  the parties confer regarding additional discovery and supplemental expert reports and jointly propose to this Court by no later than **February 22, 2013** an amended scheduling order for such fact and expert discovery; and

(3)  Veritas pay IBC's expert's fees and costs resulting from the additional discovery and supplemental reports.

## II.  IBC's Motion to Strike Expert Report

### A.  Factual Background

Veritas retained Christopher C. Barry ("Barry"), a partner in PricewaterhouseCoopers LLP, as an expert to rebut IBC's damages calculations.  (Docket # 60 at 1).  IBC argues that Barry's report should be excluded because Barry "merely loaned his name" to a report that was drafted by his colleague John McCann ("McCann").  (Docket # 60 at 9-10).  According to IBC, Barry merely edited, embellished and finalized a report that was analyzed and written by McCann.  (*Id.*).

IBC further contends that Barry's report is unreliable and should be excluded because it is based upon largely unverified financial summaries that were created by Veritas employees for the purposes of this litigation.  (Docket # 85 at 4-7).  IBC maintains that insofar as any information in the summaries was verified, it was verified by McCann, not Barry, and Barry did not adequately supervise McCann in the course of that work.  (*Id*. at 9-10).  Finally, IBC

argues that Barry's report should be excluded because his methodology for calculating overhead costs in arriving at net profits is unreasonable.[7]  (*Id*. at 8).

In response, Veritas contends that Barry was adequately involved in the preparation of his report.  (Docket # 72 at 15).  According to Veritas, Barry properly delegated tasks to his colleagues, including McCann, to aid him in his analysis and was entitled to rely upon McCann to verify the underlying data supporting the financial summaries.  (*Id.* at 10).  Any issues concerning the summaries relied upon by Barry are, Veritas maintains, questions of weight, not admissibility.  (*Id.*).  Finally, Veritas argues that Barry properly calculated the deductions for overhead costs.  (*Id*. at 14).

### 1.  **Preparation of the Report**

Two of Barry's colleagues, John McCann and Severin Ritchie, assisted him in the preparation of the expert report.  (Docket # 86, Ex. K at 13, 17).  McCann, a CPA with over fifteen years' experience, interviewed key Veritas employees, visited Veritas's premises to review electronic records maintained at the site, "directed the detailed analysis that underlies the report" and prepared the first draft of the report.  (*Id*. at 13-15, 32).  Ritchie, a less-experienced CPA, assisted in reviewing Veritas's documents and creating the spreadsheet exhibits to the report.  (*Id*. at 17).

---

[7]  IBC also argues in its reply papers that Veritas should be estopped from introducing Barry's calculation of costs because Veritas produced summary information during fact discovery that differs from the cost information on which Barry relied.  (*Id*. at 10).  This argument is improperly raised for the first time in reply.  *See*, *e.g.*, *Howard v. Cannon Indus., Inc.*, 2012 WL 5373458, *4 n.4 (W.D.N.Y. 2012) (citing *In re Dobbs*, 227 F. App'x 63, 64 (2d Cir. 2007) ("[w]e think that it was entirely proper for the District Court to decline to consider . . . argument[s] raised for the first time in [a] reply brief")).  In any event, IBC cites no authority supporting the proposition that a party is legally bound by factual assertions contained in documents produced during discovery.  Any discrepancies between information provided during fact discovery and information relied upon by Barry are, of course, proper subjects of cross-examination.

According to Veritas, Barry relied upon McCann to verify the information provided by Veritas. (*Id*. at 14, 30-33). Barry communicated with McCann about his verification work, but did not obtain a detailed report of McCann's activities during his field visit to Veritas. (*Id*. at 31-33). Rather, Barry relied upon McCann's experience and judgment to adequately perform the verification procedures. (*Id*.). Barry testified that he personally reviewed and edited the report, added information he believed was relevant and signed it. (*Id.* at 14). Specifically, he testified that there were "several iterations of the calculation that went on before it got finalized" and that he altered the "numbers" in McCann's draft, but he was unable to identify any examples of specific alterations that he made. (*Id*. at 14-15).

Barry's report relied, in part, upon various financial summaries prepared by and provided to him by Veritas in connection with this litigation (which are the same documents that are the subject of IBC's motion to preclude). (Docket # 86 at ¶¶ 44-47, 49, 51; Docket # 74, Ex. D at Ex. 3). Barry testified that the financial summaries reflected information contained on electronic records systems maintained by Veritas, known by the acronym "MRP."[8] (Docket # 86, Ex. K at 28-32).

## 2. Calculations in Barry's Report

Barry's report purports to calculate the net profits from the sales of Veritas in-house manufactured blades in 2010 and 2011 ("accused sales"). According to Barry, some of the hand planes in Veritas's inventory during the relevant time period were equipped with blades manufactured by IBC, and therefore sales of those hand planes ("non-accused sales") needed to

---

[8] According to Veritas, "MRP" is an acronym for "manufacturing resource and planning," and refers to an electronic recordkeeping system from which management reports are prepared. (Docket # 72 at 10).

be excluded from the net profit calculation.  (Docket # 74, Ex. D at ¶¶ 15, 17, 20-22).  Thus, Barry's first step in determining net profits from accused sales was to identify the total sales revenue attributable to hand planes and blades and apportion out any sales revenues attributable to non-accused sales.  (*Id.*).  To determine the correct amount to apportion, Barry primarily relied upon summary documents provided by Steven Oszmian ("Oszmian"), a Veritas engineer.  (Docket # 86, Ex. K at 79-88).  Oszmian compiled the information in those summaries from sales records, production information from the MRP system and inventory information.  (*Id.* at 48, 85).  Barry reviewed with Oszmian the methodology by which he calculated the units of accused sales, but did not independently verify the data underlying Oszmian's summary reports; Barry does not know if McCann verified any of the data.  (*Id.* at 37-39, 58, 85).

After identifying the total number of sales of accused hand planes and blades, Barry sought to calculate the sales revenue attributable to accused sales.  (Docket # 72 at 6).  To do so, Barry again relied primarily on a document created by Oszmian.  (*Id.* at 6; Docket # 60 at 3-6).  For retail sales of blades, Oszmian used the retail price provided in the product catalog.  (Docket # 86, Ex. K at 42; Docket # 74, Ex. D at ¶ 23).  For retail sales of hand planes, Oszmian used the retail catalog price for the individual blade with which the hand plane was equipped.  (Docket # 86, Ex. K at 45-47; Docket # 74, Ex. D at ¶ 23).  According to Barry, although he did not verify Oszmian's information by comparing it to the catalog, McCann did review Oszmian's methodology and may have verified the catalog prices.  (Docket # 86, Ex. K at 46-48).  For wholesale sales of hand planes and blades, the average wholesale price per unit was used.  (Docket # 74, Ex. D at ¶ 23).

After determining the number of accused blade sales and sales revenues, Barry deducted associated standard costs to determine the gross profit. (*Id.* at ¶ 24). For accused retail sales of hand planes and blades, as well as accused wholesale sales of stand-alone blades, Barry deducted the standard cost of the blade from the sales price of the blade or component blade to determine the gross profit. (*Id.* at ¶¶ 23-24 and Exs. 4 & 5). To determine the gross profit from wholesale sales of hand planes containing an in-house blade, Barry compared the cost to produce the component blade with the cost to produce the entire hand plane to obtain a ratio which he labeled the "blade apportionment." (*Id.* at ¶¶ 23-24 and Ex. 5; Docket # 72 at 6). Barry then calculated the profit per unit by subtracting the standard manufacturing cost of the hand plane from the average wholesale price of the hand plane. (Docket # 74, Ex. D at ¶¶ 23-24 and Ex. 5). Barry multiplied this number by the number of units sold and the blade apportionment ratio to obtain the "apportioned gross profit" – the amount reflecting the relative profit attributable to the accused sales of the component blade.

Barry obtained each product's manufacturing costs from documents prepared by Oszmian. (Docket # 86, Ex. K at 20-21). Oszmian gathered this information from Veritas's MRP system and provided it to Barry. (*Id.* at 20, 43). As a spot check, Barry independently verified that the bill of materials for two products matched the information provided by Oszmian. (*Id.* at 45, 51-52). The record further reveals that McCann had access to the MRP system and thus could have verified Oszmian's cost information, but does not reveal whether he did so. (*Id.* at 31-33, 45, 52).

In order to calculate overhead costs attributable to the accused sales, Barry reviewed Veritas's financial statements with its Chief Financial Officer, Nicole O'Reilly, to

determine whether each specific line item of overhead expense was associated with the manufacture and sale of hand planes or blades. (*Id.* at 89-90). Barry excluded three or four line items that were unrelated to the manufacture and sale of hand planes or blades. (*Id.*). He then apportioned the remaining line items to Veritas's total sales for all products. (*Id.* at 95-96; Docket # 74, Ex. D at Ex. 6A).

For example, Barry determined from discussions with O'Reilly that some of the expenses relating to catalog production should be deducted from the revenues generated from the accused sales because the allegedly infringing products were advertised in some of the catalogs. (Docket # 86, Ex. K at 91-95). To determine how much to deduct, Barry divided the total catalog expenses by the total sales of all products – not just hand planes and blades – for the year in question. (*Id.* at 95-96; Docket # 74, Ex. D at Ex. 6A). Barry performed this calculation for each line item that he determined was related to the manufacture or sale of hand planes or blades. (Docket # 86, Ex. K at 95-98). He then added the percentages for each line item to obtain a total percentage reflecting the ratio that overhead expenses attributable to accused sales bore to the total sales of all products. (*Id.* at 97; Docket # 74, Ex. D at ¶ 24 and Ex. 6A).

Barry opined that in 2011 overhead expenses related to the manufacture and sale of hand planes and blades represented approximately 53.5% of total sales. (Docket # 86, Ex. K at 97). Using the same methodology, Barry determined that in 2010 related overhead expenses represented approximately 49.8% of total sales for all products. (Docket # 74, Ex. D at Ex. 6A). Barry then averaged these two percentages and applied the average percentage (52%) to the sales

revenues for accused sales in 2010 and 2011 in order to determine the appropriate amount of overhead expenses to deduct from accused sales revenues.[9]  (*Id.* at ¶ 24, Ex. 6A at 10).

In performing these calculations, Barry did not attempt to determine the actual proportion of overhead expense attributable directly to the manufacture and sale of hand planes and blades, rather than other products.  (Docket # 86, Ex. K at 99).  According to IBC, sales of hand planes and blades represented only 4% of Veritas's total annual sales during the relevant period.  (*Id.* at 100-01; Docket # 85 at 8).  Barry explained the methodology in his deposition:

> the cost elements vary relatively proportionately . . . to the sales of planes and blades to the entirety . . . since we are expressing . . . the total of pertinent expenses, to the total sales, we have a percent that can be then applied to the plane and blade sales, and we thereby end up allocating their proportionate share of the direct costs.

(Docket # 86, Ex. K at 105).

## B. **Discussion**

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.   Under this rule, the court serves a "gatekeeping role" to ensure that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."

---

[9]  Barry performed this calculation for accused products sold by Lee Valley, Ltd.  (*Id.* at Ex. 6A).  Barry performed a similar calculation to determine the overhead expenses to be deducted from revenues from accused products sold by Veritas Tools (Canada).  (*Id.* at Ex. 6B).

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). Thus, the primary focus is whether the proposed expert testimony is relevant and reliable. *Id*. at 589-90; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (extending *Daubert's* holding "not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge"); Fed. R. Evid. 702 advisory committee's note (2000 Amendment) (noting Fed. R. Evid. 702 "provides that all types of expert testimony present questions of admissibility for the trial court in deciding whether the evidence is reliable and helpful"). "This two-pronged relevance/reliability determination is committed to the sound discretion of the trial court." *American Ref-Fuel Co. of Niagara, LP v. Gensimore Trucking, Inc.*, 2008 WL 1995120, *3 (W.D.N.Y. 2008) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. at 158).

Under *Daubert* and *Kumho Tire*, a court must "first determine whether the proffered testimony is relevant." *Id*. Further, the testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. at 591; *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001). The question is one of "fit," meaning that the evidence must be "sufficiently tied to the facts of the case." *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). After determining that the proffered testimony is relevant, the court must determine whether the proffered testimony "has a sufficiently 'reliable foundation' to permit it to be considered." *American Ref-Fuel Co. of Niagara, LP v. Gensimore Trucking, Inc.*, 2008 WL 1995120 at *3 (quoting *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d at 184-85). The court has "considerable leeway" in deciding how best to make that determination. *Kumho Tire Co.*, 526 U.S. at 152.

IBC argues that Barry's report is inherently unreliable for three reasons: first, because McCann, not Barry, conducted the research and analysis and drafted the report; second, because the report is not based upon "sufficient facts or data" since it relies upon unverified summary financial documents that were provided by Veritas employees; and, third, because the report is not "the product of reliable principles and methods" since it uses an improper methodology for deducting overhead expenses. Each contention is addressed below.

### 1. Expert's Reliance upon Colleague's Work

"An expert witness is permitted to use assistants in formulating his expert opinion," *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002), although an expert report that is merely a conduit for the opinion of a non-testifying expert must be excluded. *Id.* at 613; *see Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007); *see Weitz Co. v. Lloyd's of London*, 2007 WL 7131908, *3-4 (S.D. Iowa 2007) (expert's report not reliable where expert relied on assistant to perform the research, conduct the analysis and write the report without even limited involvement by the expert). Where the expert was directly involved in the research, analysis or drafting of the report, even with substantial assistance from a colleague or associate, his involvement in and knowledge of the report are matters of weight, not admissibility. *See Weitz Co.*, 2007 WL 7131908 at *3; *see also Derrickson, et al. v. Circuit City Stores, Inc.*, 1999 U.S. Dist. LEXIS 21100, *17-18 (D. Md. 1999).

Barry's testimony reveals that he directly participated in the analysis underlying his expert report. Although he relied upon McCann to conduct some verification of the underlying data and to draft the initial report, Barry testified that he thoroughly edited and

finalized the report. For example, Barry testified that he worked directly with Veritas's Chief Financial Officer to determine which overhead costs should be attributed to the manufacture of hand planes and blades. On this record, IBC has not shown that Barry is merely the mouthpiece for McCann; any issues concerning Barry's reliance upon McCann will be fodder for cross-examination. *See Weitz Co.*, 2007 WL 7131908 at *3.

As IBC correctly points out, however, it does not possess the information necessary to effectively cross-examine Barry about the verification of the underlying data because Veritas failed to provide it with the underlying data and because Barry was generally unfamiliar with the details of McCann's verification work. Under these circumstances, IBC is entitled both to obtain the underlying data and to depose McCann. *See Herman v. Marine Midland Bank*, 207 F.R.D. 26, 30-31 (W.D.N.Y. 2002) (deposition of expert's associate appropriate where expert report "was the result of substantial collaborative work by" the expert and his assistant); *see Derrickson*, 1999 U.S. Dist. LEXIS 21100 at *17-18 & n.1 (expert report admissible where expert and assistant "worked hand-in-glove, and the fruits of their labor are indivisible"; opposing party nonetheless may be entitled to production of underlying data and deposition of assistant).

### 2. Reliance upon Summary Data Provided by Veritas

Expert evidence should be excluded if it is "speculative or conjectural or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (internal citations and quotations omitted). However, "[u]nless the information or assumptions that [a party's] experts relied on were so unrealistic and contradictory as to suggest

23

bad faith, inaccuracies in the underlying assumptions or facts do not generally render an expert's testimony inadmissible." *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 269 (S.D.N.Y. 2010) (internal quotation omitted). In addition, an expert's opinion may be excluded where it relies upon "[a]ssumptions based on conclusory statements of the expert's client, rather than on the expert's independent evaluation." *Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, 2001 WL 1602976, *4 (S.D.N.Y. 2001). In sum, an expert opinion should be excluded when the data relied upon is "neither verified as to its accuracy and completeness or, if from a recognized source, is speculative in nature and therefore inherently insufficient." *Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 2005 WL 1074320, *26 (W.D.N.Y. 2005) (internal quotation omitted).

        An expert opinion is not *per se* unreliable because it relies upon some unverified or inaccurate information provided by the expert's client. *See R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d at 269 (data not inherently unreliable simply because it was provided by a party or its counsel); *see also Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 2005 WL 1074320 at *26 (suggesting unverified data may be reliable if it was prepared by party in ordinary course of business or in compliance with regulatory reporting requirements "which could provide some indicia of reliability for the data"); *see Oracle Am., Inc. v. Google Inc.*, 2012 WL 4017808, *4 (N.D. Ca. 2012) (denying motion to exclude expert opinion regarding deductible expenses on grounds that expert failed to independently verify data; party may demonstrate adequate foundation for testimony at trial by demonstrating that data was "routinely [compiled and relied upon] in the ordinary course of business"). Rather, if a party provides its expert "with a piece of false information or withheld relevant data, [the opposing party] can cross-examine the experts on this matter, calling into question the weight that the jury should accord their testimony."

*R.F.M.A.S., Inc.*, 748 F. Supp. 2d at 269.  Of course, effective cross-examination is dependent upon access to the underlying data and assumptions upon which the expert relied.  *Id.* ("[f]or this system to work, however, plaintiff's experts must lay bare the information and assumptions on which they relied").

On this record, IBC has not demonstrated that Barry relied upon unverified information provided by Veritas or that the financial summaries were inaccurate, incomplete or inherently unreliable.  First, the financial information derived from Veritas's electronic records system and presumably was compiled and relied upon by Veritas in the ordinary course of business.  Second, the record suggests that Barry relied upon McCann to verify certain of the underlying data, although it is unclear what specifically McCann did to verify it.  Of course, IBC's inability to present a complete record on this motion is not of its own making, but owes to Veritas's late production of the financial summaries and failure to produce the underlying data.

Under these circumstances, although the record as developed does not support an order excluding Barry's expert report, IBC must be afforded the opportunity to review the underlying data on which the financial summaries are based, to depose the Veritas employees who created the belatedly-produced financial summaries and to depose McCann about his verification work.  After such discovery is complete, IBC may renew its motion to exclude if it believes the record supports it.

### 3. <u>Method of Calculating Deductible Costs</u>

Under the Lanham Act, a trademark owner is entitled to recover profits that an infringer obtained by willfully violating the owner's rights.[10]  15 U.S.C. 1117(a).  To do so, the plaintiff must prove the amount of the defendant's revenues from infringing sales.  *Id.*  Once the plaintiff has met this burden, the burden shifts to the defendant to prove any costs or deductions it claims should be subtracted from the infringing revenues.  *Id.*  "Put another way, the infringer's profits are calculated as the gross sales of infringing goods minus the costs that the infringer proves are attributable to the production and sale of those goods."  *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 104 (2d Cir. 1999) (interpreting analogous provisions of Copyright Act), *cert. denied*, 528 U.S. 1160 (2000).  The infringer bears the burden of establishing costs or expenses and must prove both that "it has borne the particular cost or expense but also that the cost or expense is attributable to its unlawful sales."  *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 7 (2d Cir. 1989), *cert. denied*, 494 U.S. 1029 (1990).  "Every infringer shoulders the burden of demonstrating a sufficient nexus between each expense claimed and the sales of the unlawful goods."  *New Line Cinema Corp. v. Russ Berrie & Co.*, 161 F. Supp. 2d 293, 303 (S.D.N.Y. 2001) (quoting *Hamil Am. Inc. v. GFI*, 193 F.3d at 107).

An infringer is entitled to deduct the variable costs it incurs to manufacture or sell the infringing product so long as it can prove the costs were directly related to the infringing product.  *See Hamil Am. Inc.*, 193 F.3d at 104 (infringer permitted to deduct actual costs of

---

[10]  It is unsettled in the Second Circuit whether a party can recover profits for a non-willful trademark violation that does not involve dilution under 15 U.S.C. § 1125(c).  *See Pedinol Pharm., Inc. v. Rising Pharm, Inc.*, 570 F. Supp. 2d 498, 502 (E.D.N.Y. 2008).  *See also Borghese Trademarks Inc. v. Borghese*, 2013 WL 143807, *10 n.6 (S.D.N.Y. 2013).

production or "the variable costs of producing and selling the infringing" product); *In Design v. Lauren Knitwear Corp.*, 782 F. Supp. 824, 832 (S.D.N.Y. 1991); *see Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 642 F. Supp. 2d 276, 286 (S.D.N.Y. 2009) (defendant entitled to calculate gross profits by deducting direct costs from sales revenue). In addition, the infringer is also entitled to deduct fixed or overhead costs "if the defendant can show what portion of overhead contributed to the production and sale of the infringing products." *In Design*, 782 F. Supp. at 832.

The Second Circuit employs a two-part test to determine deductible fixed costs. *Burns v. Imagine Films Entm't, Inc.*, 2001 WL 34059379, *6 (W.D.N.Y. 2001); *see Supreme Sec. Sys., Inc. v. Sup. Sec. Servs., Inc.*, 2012 WL 1078832, *2 (E.D.N.Y.) (two-step process employed to determine deductions of overhead expenses for violations of the Lanham Act), *report and recommendation adopted by*, 2012 WL 1078469 (E.D.N.Y. 2012). "The first step is to determine what overhead expense categories (such as rent, business, entertainment, personnel and public relations) are actually implicated by the production of the infringing product." *Hamil Am. Inc.*, 193 F.3d at 105. In order to deduct a category of overhead expenses, the infringer must demonstrate "a sufficient nexus . . . between a category of overhead and the production or sale of the infringing product." *Id.* When a sufficient nexus is demonstrated between the expense category and the infringing sales, "a court need not scrutinize for inclusion or exclusion particular items within the overhead category."[11] *Id.* at 105.

---

[11] "When infringement is found to be willful, the district court should give extra scrutiny to the categories of overhead expenses claimed by the infringer to insure that each category is directly and validly connected to the sale and production of the infringing product." *Id.* at 107.

"The second step is to arrive at a fair, accurate, and practical method of allocating the implicated overhead to the infringement[, and] [t]he infringer has the burden of 'offering a fair and acceptable formula for allocating a given portion of overhead to the particular infringing items in issue.'" *Id.* (quoting 4 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 14.03 [B], at 14-39 (1996)). "[T]he Second Circuit has never required that a particular approach be applied, [and] . . . [t]he reasonableness of the proffered overhead allocation formula is a question of fact in all cases, and the relative fairness and accuracy of competing formulae will depend on the specific circumstances in a given case." *Burns v. Imagine Films Entm't, Inc.*, 2001 WL 34059379 at *7 (internal citations and quotations omitted).

Barry explained that he employed a two-step methodology to calculate the overhead costs to deduct from Veritas's gross profits from accused sales. He first determined which categories of overhead costs could be attributed to the sale of hand planes and blades. He then allocated those costs to accused sales by determining the ratio that those costs represented to total sales revenue for all products and applying that ratio to the gross profit from accused sales to arrive at the proportional amount of costs to deduct. According to IBC, apportioning overhead costs as a percentage of total sales where the total sales of hand planes and blades accounts for only approximately 4% of total sales is unreasonable, and indeed so unreasonable as to render the entire report unreliable. (Docket # 85 at 7-9).

Contrary to IBC's contention, Barry's analysis appears consistent with accepted methodology in this Circuit for determining deductible costs. *See*, *e.g.*, *In Design v. Lauren Knitwear Corp.*, 782 F. Supp. at 832-33 (defendant must first prove "that each category of overhead contributed to the production of the infringing items" and then that it must offer "a fair

and acceptable formula for allocating a given portion of overhead to those items"). Indeed, a number of courts have found that overhead costs may properly be calculated as a proportion of total sales. *See, e.g., In Design v. K-Mart Apparel Corp.*, 13 F.3d 559, 566 (2d Cir.) (collecting cases), *overruled on other grounds*, *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994); *Dolori Fabrics, Inc. v. Limited, Inc.*, 662 F. Supp. 1347, 1356 (S.D.N.Y. 1987) (calculating "overhead costs by determining what percentage of its total sales revenues was represented by overhead costs" and then multiplying that figure by sales price of infringing product); *see also Aitken, Hazen, Hoffman, Miller, P.C. v. Empire Coast Co.*, 542 F. Supp. 252, 265-66 (D. Neb. 1982).

Whether Veritas will ultimately be able to establish (1) a sufficient nexus between the categories of overhead costs included by Barry and the manufacture and sale of the accused product and (2) the reasonableness of its proposed formula for allocating overhead expenses under the circumstances of this case is uncertain at this time. *See Hamil Am. Inc.*, 193 F.3d at 92, 105 ("[t]he reasonableness of the proffered overhead allocation formula is a question of fact in all cases"); *see Warner Bros., Inc. v. Gay Toys, Inc.*, 598 F. Supp. 424, 431 (S.D.N.Y. 1984) ("[o]verhead which does not assist in the production of the infringement should not be credited to the infringer, that which does, should be; it is a question of fact in all cases") (quoting *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 54 (2d Cir. 1939) (Learned Hand, J.)). However, Barry's methodology does not appear so unreasonable on the basis of the record as it has been developed thus far to warrant excluding the report.

In summary, IBC's motion to strike Barry's report is denied without prejudice to renewal following the supplemental discovery outlined in this decision.

## <u>CONCLUSION</u>

For the reasons discussed above, IBC's motions to preclude reliance on certain documents and to strike the report of Christopher C. Barry **(Docket ## 60, 61)** are **DENIED**.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
                                                        MARIAN W. PAYSON
                                                    United States Magistrate Judge

Dated:  Rochester, New York
        January  29 , 2013